GRIFFITH LABORATORIES U.S.A., Plaintiff-Appellant, v. THE METRO-POLITAN SANITARY DISTRICT OF CHICAGO, Defendant-Appellee.

First District (4th Division)   No. 87—1349

Opinion filed March 24, 1988.

Barbara Anne Magel, of Karaganis & White Ltd., of Chicago, and Gregory Schmidt and James Legg, both of Griffith Laboratories U.S.A., of Alsip, for appellant.

Allen S. Lavin, James B. Murray, and Antoni E. Wesolowski, all of Chicago, for appellee.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The plaintiff, Griffith Laboratories U.S.A., brought this appeal from an order of the trial court denying its request pursuant to the Illinois Freedom of Information Act (FOIA) (Ill. Rev. Stat. 1985, ch. 116, par. 201 et seq.) for disclosure of certain sampling data and calculations compiled by the defendant, Metropolitan Sanitary District of Greater Chicago (MSD). The question before us is whether the information sought by Griffith is exempt from disclosure under section 7(c)(i) of the FOIA. (Ill. Rev. Stat. 1985, ch. 116, par. 207(c)(i).) Section 7(c)(i) exempts from disclosure "[i]nvestigatory records compiled for State or local administrative law enforcement purposes," to the extent that disclosure would "interfere with pending or actually and reasonably contemplated enforcement proceedings." Ill. Rev. Stat. 1985, ch. 116, par. 207(c)(i).

The MSD is a public agency charged with the responsibility of collection, treatment and disposal of sewage in the Chicago metropolitan area, as well as enforcement of State and Federal water pollution laws. Section 46 of the Illinois Environmental Protection Act (Ill. Rev. Stat. 1985, ch. 111½, pars. 1046(b), (c)) empowers the MSD to enact ordinances providing for proportionate cost sharing by users of the MSD's waste-treatment services. Pursuant to this statutory authority, the MSD enacted its User Charge Ordinance, which provides for proportionate cost sharing and sets up a system which enables the MSD to secure compliance with those provisions. The system is essentially a self-reporting one, requiring users to sample the wastes which they discharge into the sewer system and report the results to the MSD. The ordinance calls for sampling to be done on an annual basis, but

requires that any additional sampling performed by the user be reported to the MSD. Section 5 of the User Charge Ordinance enables the MSD to monitor the self-reporting system by conducting its own inspections and sampling analyses. In determining the amount of the user's bill, the MSD may rely upon the self-reported data, MSD data, or a combination of the two. Section 9 contains an appeals process which allows the user to challenge the bill by submitting a "detailed written request" specifying the reasons for the challenge. Section 10 provides for enforcement of the ordinance, stating that the MSD "may sue to recover any and all amounts due and owing as provided herein and take such other and further action as may be necessary to recover all such sums due it hereunder, restrain any unlawful discharge and *otherwise compel compliance with the provisions of this Ordinance.*" (Emphasis added.)

Griffith is classified as a large commercial-industrial user under the ordinance and operates plants in Chicago and Alsip, Illinois. In 1985, Griffith received a bill from the MSD which was significantly higher than bills for previous years. Griffith sought to challenge the bill through the User Charge Ordinance's appeals process and asked the MSD for its sampling data and calculations in order to prepare the "detailed written request" required by the ordinance. The MSD replied that pursuant to its standard operating procedure, MSD sampling data would be released to Griffith only after Griffith turned over to the MSD all of Griffith's sampling data for the period in question. The MSD did, however, provide Griffith with a "summary table" of the data and calculations used in arriving at Griffith's bill.

Griffith then filed a two-count complaint for injunctive relief, seeking a court order to compel disclosure of the MSD sampling data and calculations pursuant to the Illinois Freedom of Information Act (Ill. Rev. Stat. 1985, ch. 116, par. 201 *et seq.*). The complaint was subsequently amended to add counts III and IV, which requested the sampling data and calculations used by the MSD in determining Griffith's estimated monthly user charge for 1987. The MSD filed a motion to dismiss under section 2—619 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—619) alleging that the requested information was exempt from disclosure under section 7(c)(i) of the FOIA. This section exempts from disclosure investigatory records compiled for law enforcement purposes to the extent that disclosure would interfere with pending or actually and reasonably contemplated enforcement proceedings. (Ill. Rev. Stat. 1985, ch. 116, par. 207(c)(i).) Attached to the motion to dismiss were a copy of the User Charge Ordinance and the affidavit of Cecil Lue-Hing, the MSD direc-

tor of research and development, which stated that an enforcement proceeding was contemplated if Griffith did not pay the bill and that disclosure of the requested records would interfere with the enforcement proceeding.

Attached to Griffith's second-amended complaint, which requested the sampling data and calculations used by the MSD in computing the estimated monthly user charge for 1987, were copies of correspondence which revealed that the MSD again relied upon exemption 7(c)(i) to deny Griffith's FOIA request. In a letter dated February 20, 1987, MSD's general superintendent Frank E. Dalton stated that the requested records were compiled by the MSD and used to verify the user-established sampling data in order to administer that the User Charge Ordinance. Dalton restated the MSD's standard operating procedure which requires the user to certify that it had given the MSD all of its sampling data before the MSD would furnish the user with MSD verification sampling data.

At a hearing on a motion to dismiss, counsel for the MSD amplified the reasons for the MSD's position that release of its data prior to receiving assurance that it had been given all of Griffith's data would interfere with the MSD's enforcement of the User Charge Ordinance. Counsel stated that if the MSD were required to give the user MSD verification sampling data before obtaining all user-established data for the same period, there would be a danger that in a subsequent dispute over the amount of a bill, the user would eliminate any of its own sampling data which showed higher concentrations of waste than the data compiled by the MSD. Counsel for Griffith responded that its sampling was done by an independent laboratory and that for MSD's fears to be realized, fraud and conspiracy to commit fraud would have to be presumed.

At the conclusion of the hearing, the trial court denied MSD's motion to dismiss as to counts I and II, which involved the 1985 data and calculations, but granted the motion as to counts III and IV, which pertained to the data and calculations used to formulate the 1987 bill. This appeal concerned only the propriety of the trial court's order dismissing counts III and IV.

On appeal, Griffith contends that the dismissal of counts III and IV constituted error because the MSD's motion to dismiss contained only conclusory statements which were insufficient to support its claim that the requested records are exempt from disclosure under section 7(c)(i) of the FOIA. Essentially, Griffith advances two arguments regarding the sampling data and calculations which it seeks to obtain from the MSD. First, it maintains that the requested informa-

tion constitutes "routine accounting materials" used to calculate a bill rather than investigatory records compiled for administrative law enforcement purposes. Second, it claims that even if the data were to be considered investigatory records, the MSD failed to establish that disclosure would interfere with a pending or actually and reasonably contemplated enforcement proceeding.

■ The purpose of the Illinois FOIA is to ensure that the public be given full and complete information regarding the affairs of government. (*Hoffman v. Department of Corrections* (1987), 158 Ill. App. 3d 473, 511 N.E.2d 759.) To that end, the statute provides that the stated exemptions "should be seen as limited exceptions to the general rule" of disclosure. (Ill. Rev. Stat. 1985, ch. 116, par. 201.) Courts interpreting the exemptions have held that they must be narrowly construed. (*City of Monmouth v. Galesburg Printing & Publishing Co.* (1986), 144 Ill. App. 3d 224, 494 N.E.2d 896.) However, as pointed out by the MSD, the FOIA also states that "[t]his Act is not intended to be used *** for the purpose of furthering a commercial enterprise, or to disrupt the duly-undertaken work of any public body independent of the fulfillment of any of the fore-mentioned rights of the people to access to information." Ill. Rev. Stat. 1985, ch. 116, par. 201.

The exemption at issue in the case at bar provides:
"The following shall be exempt from inspection and copying:
*** ***

(c) Investigatory records compiled for State or local administrative law enforcement purposes *** but only to the extent that disclosure would:

(i) interfere with pending or actually and reasonably contemplated enforcement proceedings." (Ill. Rev. Stat. 1985, ch. 116, par. 207(c)(i).)

The parties have not called our attention to any Illinois case interpreting this exemption. However, because the Illinois FOIA closely parallels the Federal FOIA,[1] the interpretations adopted by the Federal courts are particularly persuasive with respect to the issue before us.

■ The first argument made by Griffith is that the requested records containing sampling data and calculations are "routine accounting materials" used to determine Griffith's bill rather than investiga-

---

[1]Section 552(b) of the Federal FOIA provides: "This section does not apply to matters that are *** (7) investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings ***." 5 U.S.C. §552(b)(7)(A) (1982).

tory records compiled for local administrative law enforcement purposes. Griffith claims that to be considered investigatory records, the records must be created during the course of a search for evidence of some suspected violation of MSD requirements. As summarized earlier, the User Charge Ordinance sets up a system in which self-reported data generated by the user is employed in determining the amount of the user's bill. In order to compel compliance with the requirements of the self-reporting system, the MSD monitors the user's data by conducting its own sampling. In other words, it investigates to determine whether the user is meeting the requirements of the ordinance, thereby compelling compliance with the self-reporting system. Using this reasoning, we believe that the requested records are properly considered investigatory records compiled for law enforcement purposes.

The second argument raised by Griffith poses a far more difficult question. Griffith contends that the MSD has failed to establish that disclosure of the requested records would interfere with a pending or actually and reasonably contemplated enforcement proceeding. In our view, the key to resolving this question lies in determining the scope of the term "enforcement proceeding" in the context of the instant cause.

Griffith correctly asserts that the majority of cases interpreting the term "enforcement proceeding" within the meaning of the FOIA exemption from disclosure involve situations in which a law enforcement agency suspects that a certain subject is violating the law. (*Hatcher v. United States Postal Service* (D.D.C. 1982), 556 F. Supp. 331; *Hunt v. Commodity Futures Trading Comm'n* (D.D.C. 1979), 484 F. Supp. 47.) Obviously, in those cases, the agency conducts an investigation with a view toward instituting an adjudicatory proceeding against the suspected violator. The case at bar differs from this scenario because the essential task of the MSD in administering the User Charge Ordinance is not to prosecute violators, but rather to ensure an accurate determination of the user's bill by compelling compliance with the self-reporting system set up under the ordinance. A very similar factual setting was presented in *Moorefield v. United States Secret Service* (5th Cir. 1980), 611 F.2d 1021, *cert. denied* (1980), 449 U.S. 909, 66 L. Ed. 2d 139, 101 S. Ct. 283.

In *Moorefield*, a man who was twice convicted of threatening the life of the United States President filed suit under the Federal FOIA to gain access to the file maintained on him by the Secret Service. The Secret Service moved for summary judgment on the grounds that the file was exempt from disclosure as an investigatory record com-

piled for law enforcement purposes, disclosure of which would interfere with an enforcement proceeding. (5 U.S.C. §552(b)(7)(A) (1982).) The motion was granted and Moorefield appealed, claiming that no enforcement proceeding existed because the Secret Service was not contemplating any judicial proceeding against him. Thus, he argued, disclosure of the file could not interfere with an enforcement proceeding within the meaning of the FOIA exemption. In rejecting Moorefield's argument, the court made a distinction between "prosecutorial" investigations and "protective" investigations. It noted that the primary law enforcement purpose of the Secret Service was not to prosecute persons who attacked the President, but rather to prevent such attacks from occurring. Specifically, the court stated:

> "In discharging its responsibility to protect the President, the Secret Service does not conduct its routine investigations with a view towards apprehending law-breakers and bringing them to justice. Thus, if the Service has succeeded in its prophylactic mission, it should never appear in an adjudicatory proceeding to prosecute the assailant of a President, or any of its other protectees. Its job is to *prevent* an attack from ever being made. In the views of Senator Hart, who introduced the 1974 exemption amendment (including section 7(A)), 'enforcement proceedings' correspond with 'law enforcement purposes,' and such purposes include the prevention as well as the detection and punishment of violations of the law. (Citations omitted.)" (*Moorefield v. United States Secret Service* (5th Cir. 1980), 611 F.2d 1021, 1025, *cert. denied* (1980), 449 U.S. 909, 66 L. Ed. 2d 139, 101 S. Ct. 283.)

Thus, the *Moorefield* court noted that the Secret Service accomplishes its purpose by conducting protective investigations rather than investigations designed to result in the prosecution of the particular subject. The court stated that under such circumstances the Secret Service investigations were directed toward an "active and concrete effort to enforce the law," and therefore constituted an enforcement proceeding, even though no judicial proceeding was contemplated.

■ In the case at bar, the purpose of the MSD in administering the User Charge Ordinance is to collect from each user its proportionate share of the cost involved in treating the sewage discharged into the sewer system. It does this primarily by relying upon a self-reporting system under which each user samples its own wastes. The purpose of the MSD in monitoring the user by collecting its own sampling data is to ensure compliance with the self-reporting system and thereby prevent violations of the ordinance. As in *Moorefield,* if the

MSD succeeds in accomplishing this preventive mission, an adjudicatory proceeding to prosecute violations would not be necessary. Applying the *Moorefield* analysis, we conclude that the records in question were compiled as part of an investigation directed toward an active and concrete effort to enforce the law. In the context of the factual setting before us, this effort in itself constitutes an "enforcement proceeding" within the meaning of section 7(c)(i) of the FOIA.

■ Finally, we are satisfied that the MSD has established that disclosure of the records would interfere with its efforts to enforce the User Charge Ordinance. As stated earlier in this opinion, the MSD advanced the possibility that if the user had access to the MSD sampling data before furnishing all user-established data to the MSD, the user would have no incentive to report any of its own sampling data that showed higher concentrations of waste than those contained in the MSD samples. The self-reporting system as it now stands under the User Charge Ordinance would effectively be rendered useless. Although not essential to our disposition, we note that the MSD's argument as to the likelihood of interference is bolstered by its "standard operating procedure" with respect to the release of its sampling data to the user. The MSD is not resisting disclosure under all circumstances. Rather, it has stated that it would release the requested records if Griffith would certify that it has given the MSD any or all of its own sampling data for the time period in question. It appears from this position that the MSD is not adopting a general resistance to disclosure but is attempting to address what it perceives to be a valid danger to its administration of the User Charge Ordinance.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

LINN and McMORROW, JJ., concur.